J-A31006-14 & J-A31007-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: S.W.C., A MINOR, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: R.L., MOTHER, | |
| Appellant | No. 963 MDA 2014 |

Appeal from the Order Entered May 5, 2014
In the Court of Common Pleas of York County
Juvenile Division at No(s): CP-67-DP-0000103-2012

| | |
|---|---|
| IN RE: ADOPTION OF: S.W.C., | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: R.L., | |
| Appellant | No. 951 MDA 2014 |

Appeal from the Decree May 5, 2014
In the Court of Common Pleas of York County
Orphans' Court at No(s): 2013-0119

BEFORE: BOWES, OTT, and STABILE, JJ.

MEMORANDUM BY BOWES, J.:                    **FILED NOVEMBER 12, 2014**

R.L. ("Mother") appeals from the contemporaneous order and decree entered on May 5, 2014, wherein the trial court changed S.W.C.'s permanency goal from reunification to adoption and terminated Mother's parental rights to the child. As the appeals flow from identical facts and

Mother combined both of her arguments into a single brief, we address the appeals collectively and affirm.[1]

S.W.C. was born during May 2009 of an ongoing relationship between Mother and C.B.C. ("Father"). York County Office of Children and Youth, Services ("CYS") became involved with the family during May of 2012 due to allegations that Father sexually abused S.W.C.'s older half-sister over a four-year period. Father was determined to be an indicated perpetrator of abuse. On June 4, 2012, the victim, S.W.C., and another half-sibling, who subsequently leveled allegations of abuse against Father, were placed together in emergency shelter care. The latter allegations of abuse were also substantiated. On June 12, 2012, the juvenile court adjudicated the three children dependent. The children remained together in the foster home, which is now a pre-adoptive resource. The trial court also terminated Mother's parental rights to S.W.C.'s half-sisters. Mother did not appeal those orders, and their birth father relinquished his parental rights and consented to the adoption by the foster parents.

The original permanency goal for all of the children was reunification with Mother. In order to achieve that goal, CYS crafted a family service plan ("FSP") that directed Mother to maintain contact with CYS, complete a non-offending parenting class and a parental education program, obtain a

---

[1] On the same date, the trial court terminated the parental rights of C.B.C., S.W.C.'s birth father. We address the appeal from that order separately.

psychological evaluation and comply with treatment recommendations, and maintain a safe home. The FSP was subsequently amended to include a requirement that Mother and her then-paramour and now husband, N.L., complete evaluations to address past criminal history, including N.L.'s convictions for statutory sexual assault and corruption of minors. Mother was directed to attend weekly therapy at Pressley Ridge and cooperate with separate in-home services provided by Pressley Ridge. Additionally, Mother and N.L. were directed to comply with the visitation schedule.

Initially, Mother complied with the FSP. She attended a psychiatric evaluation, finished the intake portion of a non-offenders parenting class, and completed general parenting classes at Family Child Resources. Likewise, early in the process, Mother maintained consistent supervised visitation with S.W.C., and CYS moved the supervised visitations from the agency into Mother's home. However, during the dependency process, S.W.C.'s behavior during the visitations became erratic in that he displayed aggression and defiance and engaged in tantrums. Mother struggled to redirect the child's activities and often countered his behavior with excessively long time-outs. By the time that CYS ultimately sought to change the child's permanency goal, he no longer wanted to visit Mother.

Within three months of S.W.C.'s dependency adjudication, Mother still failed to initiate the therapy recommended following her psychiatric evaluation. Similarly, by February 2013, Pressley Ridge sought to terminate its in-home-service component because Mother required intensive services

beyond its capabilities. For example, while Mother was delinquent on her bills, she rejected attempts by the in-home service team to formulate a budget. Moreover, N.L.'s sex-offense evaluations remained pending at that time. Pressley Ridge characterized the family's prognosis as "very guarded" due to the level of trauma and the level of effort required to mend the family relationship and develop appropriate parenting skills. CYF Exhibit 5, Pressley Ridge Closing Summary, at 4. It recommended that Mother continue with regular outpatient counseling services. *Id*. at 3.

Later, during April 2013, Mother's therapist reported that Mother struggled to recognize how her traumatic history with sexual abuse affected her parenting abilities. She reported that Mother missed at least sixteen of the fifty-three scheduled therapeutic sessions. N.L. completed some components of his evaluation, but neither he nor Mother had finished their respective risk assessments at that point. Likewise, the court-appointed child advocate ("CASA") reported that Mother started serially misinforming S.W.C. and his sisters that she had become pregnant and suffered a miscarriages. However, since Mother had a tubal ligation during July 2012, her claims of pregnancy were untrue. In the ensuing months, Mother's therapist reported that Mother's attendance had become more inconsistent. At one juncture, Mother missed fourteen of twenty-four sessions.

On October 30, 2013, CYS filed a petition to change S.W.C.'s permanency goal from reunification to adoption and filed a petition to terminate Mother's and Father's parental rights. CASA concurred in CYS's

decision and, on January 7, 2014, it issued a comprehensive report concluding that it was in the best interests of S.W.C. and his two siblings to change their permanency goal to adoption and terminate Mother's parental rights. The court convened evidentiary hearings on January 10 and February 27, 2014. CYS presented testimony from the case worker assigned to the family and from the family advocate who was associated with Catholic Charities. Mother testified on her own behalf.

On May 5, 2014, the trial court granted CYS's petitions, terminated Mother's parental rights, and change S.W.C.'s permanency goal to adoption. These timely appeals followed. Mother filed a Rule 1925(b) statement asserting three issues that she reiterates on appeal as follows:

> I. Whether the trial court erred changing the goal from reunification to adoption.
>
> II. Whether the trial court erred in terminating the parental rights of Mother . . . pursuant to [§] 2511(a)(1), (2), (5) and (8) of the Adoption Act.
>
> III. Whether the trial court erred in concluding that termination of parental rights would best serve the needs and welfare of the children pursuant to [§] 2511(b) of the Adoption Act.

Mother's brief at 5.

Mother challenges the trial court's decision to change S.W.C.'s permanency goal to adoption and its decision to terminate Mother's parental rights pursuant to the Adoption Act, 23 Pa.C.S. § 2511(a) and (b). While the court's determinations are related factually, the two decisions implicate

different considerations. *See In re A.L.D.*, 797 A.2d 326, 339-340 (Pa.Super. 2002) ("the issues and purposes of the proceedings before the Juvenile Court and the Orphans' Court are wholly distinct"). Indeed, unlike involuntary termination proceedings, which concentrates principally upon a parent's action and inaction,[2] the focus of dependency proceedings is "on the children's safety, permanency, and well-being," and not on the parent's conduct. *In re N.C.*, 909 A.2d 818, 822-823 (Pa.Super. 2006); *In re K.J.*, 27 A.3d 236, 241 (Pa.Super. 2011) (citations omitted) (Juvenile Act's mandate clearly places trial court's focus on best interests of child).

First, we review the trial court order changing the permanency goals from reunification to adoption. The following principles are relevant to our review:

> In cases involving a court's order changing the [court-ordered] goal . . . to adoption, our standard of review is abuse of discretion. To hold that the trial court abused its discretion, we must determine its judgment was manifestly unreasonable, that the court disregarded the law, or that its action was a result of partiality, prejudice, bias or ill will. While this Court is bound by the facts determined in the trial court, we are not tied to the court's inferences, deductions and conclusions; we have a responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record. Therefore, our scope of review is broad.

---

[2] Only after clear and convincing evidence is presented to establish that a parent's action or inaction satisfies the statutory grounds for termination pursuant to § 2511(a) will the trial court consider the child's developmental, physical, and emotional needs and welfare under § 2511(b).

*In re S.B.*, 943 A.2d 973, 977 (Pa.Super. 2008) (citations omitted); *see also In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010).

This issue is controlled by the Juvenile Act, 42 Pa.C.S. § 6301-6375, which was amended in 1998 to conform to the federal Adoption and Safe Families Act ("ASFA"), 42 U.S.C. § 671-679. In *In re M.S.*, 980 A.2d 612, 615 (Pa.Super. 2009) citing 42 Pa.C.S. § 6301(b)(1), we explained,

> Both statutes are compatible pieces of legislation seeking to benefit the best interest of the child, not the parent. . . . ASFA promotes the reunification of foster care children with their natural parents when feasible. . . . Pennsylvania's Juvenile Act focuses upon reunification of the family, which means that the unity of the family shall be preserved "whenever possible."

As such, child welfare agencies are required to make reasonable efforts to return a foster child to his or her biological parent. *In re N.C.*, 909 A.2d 818, 823 (Pa.Super. 2006). When those efforts fail, the agency "must redirect its efforts toward placing the child in an adoptive home." *Id*.

During permanency review hearings, trial courts must address the following considerations relevant to the child's wellbeing.

**(f) Matters to be determined at permanency hearing.—**

At each permanency hearing, a court shall determine all of the following:

(1) The continuing necessity for and appropriateness of the placement.

(2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.

(3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.

(4) **The appropriateness and feasibility of the current placement goal for the child**.

(5) The likely date by which the placement goal for the child might be achieved.

(5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.

(6) Whether the child is safe.

. . . .

(9) If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child[.]

**(f.1) Additional determination.--**Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:

(1) **If and when the child will be returned to the child's parent**, guardian or custodian in cases where the return of the child is best suited to the safety, protection and physical, mental and moral welfare of the child.

(2) **If and when the child will be placed for adoption**, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

42 Pa.C.S. § 6351(f)(1)-(6) and (9), (f.1) (1) and (2) (emphasis added). As we have indicated, "[t]hese statutory mandates clearly place the trial court's focus on the best interests of the child." *In re S.B.*, *supra* at 978 (citation omitted). Importantly, "[s]afety, permanency, and well-being of the child must take precedence over **all** other considerations." *Id*. (citation omitted; emphasis in original). Moreover, the burden is on the child welfare agency "to prove the change in goal would be in the child's best interest." *In re D.P.*, 972 A.2d 1221, 1227 (Pa.Super. 2009).

Instantly, we discern no abuse of discretion by the trial court in changing S.W.C.'s goal from reunification to adoption. After a thorough review of the parties' briefs, pertinent law and the certified record, we conclude that the trial court cogently and accurately addressed this aspect of Mother's argument in its well-reasoned opinion entered on May 6, 2014. Therefore we affirm the the order changing S.W.C.'s permanency goal on the basis of that opinion.[3]

_____

[3] The relevant analysis starts on page eighteen of the trial court opinion and concludes on page twenty-three. In addition to adopting the trial court's analysis, we specifically reject Mother's argument that the trial court was preoccupied with the threat that N.L. would pose to S.W.C.'s sisters if the family was reunified. Mother asserts that the trial court improperly transferred those concerns to the case at bar. This position permeates each issue raised in her brief. However, notwithstanding Mother's protestations to the contrary, the trial court's consideration of the genuine risk that N.L. posed to the children related to the quality of Mother's decision-making ability generally insofar as she would willingly expose her adolescent daughters to a convicted sex offender with a predilection for pubescent girls.
*(Footnote Continued Next Page)*

Next, we address whether the trial court erred in terminating Mother's parental rights pursuant to Pa.C.S. § 2511(a) and (b). We apply the following standard of review of an order terminating parental rights:

> In cases concerning the involuntary termination of parental rights, our review is limited to a determination of whether the decree of the termination court is supported by competent evidence. **Adoption of B.D.S.**, 494 Pa. 171, 431 A.2d 203, 207 (1981). The party petitioning for termination "must prove the statutory criteria for that termination by at least clear and convincing evidence." **In re T.R.**, 502 Pa. 165, 465 A.2d 642, 644 (1983). Clear and convincing evidence is defined as "testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." **Matter of Sylvester**, 521 Pa. 300, 555 A.2d 1202, 1203–04 (1989).

**In re Adoption of L.J.B.**, 18 A.3d 1098, 1107 (Pa. 2011). As the ultimate trier of fact, the trial court is empowered to make all determinations of credibility, resolve conflicts in the evidence, and believe all, part, or none of the evidence presented. **In re A.S.**, 11 A.3d 473, 477 (Pa.Super. 2010). "If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." **Id**.

Requests to involuntarily terminate a biological parent's parental rights are governed by 23 Pa.C.S. § 2511, which provides in pertinent part as follows:

---

*(Footnote Continued)* ───────────────

Hence, the trial court's reference to any potential for abuse by N.L. is an indictment of Mother's parenting rather than a finding that N.L. is a direct threat to S.W.C.

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1)    The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2)    The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . . .

(5)    The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

. . . .

(8)    The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

. . . .

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511.

The test for terminating parental rights consists of two parts. In **In re L.M.**, 923 A.2d 505, 511 (Pa.Super. 2007), we explained:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

We need only agree with the orphans' court's decision as to one subsection of 23 Pa.C.S. § 2511(a) and the subsection (b) analysis in order to affirm the termination of parental rights. **In re B.L.W.**, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). Herein, the certified record supports the orphans' court's determination that CYS established the statutory grounds to

- 12 -

terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(8) and

(b). Hence, we do not address the remaining statutory grounds.

We have explained our review of the evidence pursuant to § 2511(a)(8), as follows:

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8), the following factors must be demonstrated: (1) The child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child.

*In Re Adoption of M.E.P.*, 825 A.2d 1266, 1275-1276 (Pa.Super. 2003).

Thus, in order to satisfy the requirements of § 2511(a)(8) in the case at bar, CYS was required to produce clear and convincing evidence that: (1) S.W.C. has been removed from Mother for at least twelve months; (2) the conditions which led to the child's removal continue to exist; and (3) involuntary termination of parental rights would best serve S.W.C.'s needs and welfare. *See In re Adoption of R.J.S.*, 901 A.2d 502 (Pa.Super. 2006). "Notably, termination under Section 2511(a)(8), does **not** require an evaluation of Mother's willingness or ability to remedy the conditions that led to placement of her children." *Id*. at 511 (emphasis in original).

First, we observe that S.W.C. has been in CYS's care since June 4, 2012, based upon the substantiated allegations of sexual abuse perpetrated by Father against S.W.C.'s adolescent half-siblings. As CYS did not file its petition to terminate Mother's parental rights until October 30, 2013,

approximately seventeen months later, CYS satisfied the threshold requirement of § 2511(a)(8), which mandates that the child be removed from Mother for at least twelve months. Next, the certified record reveals that the condition that led to S.W.C.'s removal from Mother's care in June 2012, Mother's inability to provide her son a safe and secure environment continued to exist, and that terminating Mother's parental rights would best serve S.W.C.'s needs and welfare.

During the evidentiary hearing, Karen Beard, the CYS caseworker assigned to the family since June 2013, testified that she was the current custodian of the family's file. N.T., 2/10/14, at 11. Ms. Beard indicated that, prior to the agency's involvement with the family during June 2012, Mother was involved with the child service agency in Blair County that resulted in the termination of her parental rights of another child. *Id*. at 13. Similarly, she explained that, prior to the sexual abuse that is the genesis of the instant case, Father was identified as an indicated perpetrator of sexual abuse and was listed on the Child Line abuse registry in Cumberland County. *Id*. Additionally, in the weeks proceeding the underlying report that Father had sexually abused S.W.C.'s half-sister for the previous four years, Father was found to be in contempt for violating a protection from abuse order based upon his surreptitious residence at Mother's home. *Id*. Father parked in the rear of the property to avoid detection. *Id*. However, the children confirmed Father's presence in the home during the relevant time. *Id*.

Ms. Beard expounded, "Mother failed to assure the safety of the children by allowing [Father] to reside in the residence and have ongoing contact with the children." *Id*. at 13-14.

Ms. Beard also testified about Mother's current living situation. At the date of the hearing, Mother resided with her current husband, N.L., in a rental home in York. *Id*. at 21, 23. Since the adjudication of dependency, Mother source of income was limited to SSI disability insurance. *Id*. at 25-26. She receives $720 per month due to her diagnosis of major depressive disorder. *Id*. at 27. Mother has not been employed outside of the home for approximately ten years. *Id*. at 25-26. N.L. works part-time as a cook at Buffalo Wild Wings.

Ms. Beard indicated that Mother's residence was unsafe. *Id*. at 22. It reeked of dog waste and had issues with mold due to ceiling leaks. *Id*. While Mother apparently "scraped" the mold off the walls, the wall paneling was bowed and remained wet to the touch. *Id*. Portions of tile were missing from the kitchen walls and floor. *Id*. Approximately one-third of the tiles were missing from the bathroom ceiling due to the leaks, and the third-floor ceiling was cracked. *Id*. at 22-23. Additionally, portions of the floor was unstable and yielded to Ms. Beard's weight when she walked on it. She opined that the physical state of the residence was not appropriate for the return of S.W.C. and his half-sisters. Moreover, Mother was in the

process of being evicted from the residence for failure to pay rent. *Id*. at 23.

As it relates to visitation, Ms. Beard testified that Mother consistently participated in the twice-a-week supervised visitations with S.W.C. and his sisters. *Id*. at 28-29. The visitations lasted one and one-half hours on Mondays and Wednesday. *Id*. at 28. CYS briefly contemplated removing supervision, but Mother refused to prevent the children's contact with N.L., a convicted sex offender. The supervision was re-imposed within two weeks. *Id*. at 29-30. Ms. Beard testified that Mother was unable to interact effectively with all three children at the same time. *Id*. at 31. She explained that S.W.C.'s behavioral issues required that she focus her attention on disciplining that child to the exclusion of the other children. *Id*. at 32. However, Mother never requested separate visitations. *Id*.

In relation to the mental health component, Ms. Beard reported that Mother submitted to a psychiatric evaluation and participated in two of the three types of recommended therapy. *Id*. at 37-38. However, Mother did not fully comply with the additional recommendations outlined in a report authored by Suzanne Ashwood for the Commonwealth Clinical Group. *Id*. at 38. Likewise, Ms. Beard noted that Mother was discharged from Pressley Ridge in-home services due to slow progress and the improbability of reunification. *Id*. at 39. CYS never refused any services that Mother requested. *Id*. at 40.

Ms. Beard concluded that it was in S.W.C.'s best interest to prepare the child for adoption because issues existed regarding Mother's ability to protect the children from harm. She recommended terminating Mother's parental rights "so that [S.W.C.] would have a safe and stable home with family members that can provide adequate care and protection." *Id*. at 58. Ms. Beard stated that, as it relates to the children's safety and the issues that Mother and her partners had as respective victims and perpetrators of sexual abuse, Mother is in the identical place that she was when S.W.C. and his sisters were removed from her care in June of 2012. *Id*. at 59. Stated simply, other than visitation, Mother failed to make progress toward addressing the issues that caused S.W.C.'s placement, *i.e.*, his safety. *Id*. at 57. Ms. Beard effectively recognized that there were many outstanding concerns that Mother needed to address, and stated that she could not see a light at the end of the tunnel. *Id*. at 59. Thus, she believed that Mother was not close to accomplishing her parenting goals.

Furthermore, as Ms. Beard observed, the services that Mother utilized were not sufficient to facilitate reunification. *Id*. at 58. Ms. Beard highlighted that Mother often indicates an understanding of the importance of protecting S.W.C. and his sisters only to behave in a manner that leads the agency to question her actual ability to protect them from harm. *Id*. at 41. Critically, Ms. Beard testified that CYS is concerned that Mother fails to comprehend how her choices regarding N.L. affect her children and how

those choices are interpreted as failing to protect them from a convicted child abuser. *Id*. at 51-52. As it relates to Mother's inability to perceive potential threats to her children generally, Ms. Beard proffered the following illustration regarding N.L.:

> Our agency just has concerns with [N.L.'s] charges[.] . . . [W]e met with Dr. Turner who reviewed [N.L.'s] . . . sexual history polygraph [examination], and the polygraph revealed an interest . . . in, like, 13 to 18 year old[s], but he was also recommended for like treatment within that time span, but [T.H.'s] 11 so she's – that's where our concerns lie.

*Id*. at 52. She continued that, even though N.L. is attending counseling, he failed to implement the various recommendations from his sex-offender evaluations. *Id*. at 53. The agency is worried by the fact that, despite N.L.'s history with sex abuse of adolescent girls and the direct harm that he poses to her daughters' safety, Mother dismisses the potential danger. *Id*. at 54. Indeed, Mother, herself a victim of sexual abuse, informed Ms. Beard that her daughters "should move on [and] get over" the sexual abuse they endured. *Id*. at 55. Moreover, Mother not only knew of N.L.'s sexual predilections before she married him, she minimized the issues even though the children had been removed from her care due to Father's sexual abuse of the girls. *Id*. Rather than insulate her children from this potential threat, Mother encouraged S.W.C. and his sisters to refer to N.L. as "daddy" and the children acquiesced. *Id*. at 56. Mother's lack of empathy for her daughters' prior victimization in this regard evidences her inability to appreciate the risks of harm posed to all of the children, including S.W.C. *Id*. at 67.

Emily Verschoor's testimony was consistent with Ms. Beard. Ms. Verschoor was the family advocate that Catholic Charities assigned to this matter. *Id*. at 138-139. She was involved with the case between July 2013 and December 2013. *Id*. at 138. Her duties were to assist with reunification, provide parenting and life skills, supervise visitations, and support CYS generally. *Id*. at 139. She supervised Mother's bi-weekly visitations with S.W.C. and his sisters and conducted parenting lessons for Mother. She testified that she supervised thirty-three visitations. *Id*. at 140.

In relation to the supervised visitations, Ms. Verschoor stated that S.W.C. initially resisted contact with Mother, but "after a few months," he attend visitations without opposition. *Id*. at 141. S.W.C. never revealed why he objected to the visitations, but his sisters vocalized to their foster mother that they feared Mother would not protect them from N.L. *Id*. at 150, 152-153. Moreover, the quality of the visitations was poor. *Id*. Mother struggled to apply the tactics and strategies that she learned in parenting classes. *Id*. Ms. Verschoor explained that, with prompting, Mother applied her training during the first visitation following the lesson; however, she could not retain the information and apply it later. *Id*. at 145, 147. At other times, Mother become frustrated and overwhelmed. *Id*. at 156.

When Ms. Verschoor attempted to conduct visitation in the community, the visits turned chaotic. *Id*. at 158. Mother was simply unable to control the three children in public. *Id*. at 158-159. Ms. Verschoor further explained, "They would not listen to her. They did not respect what she was saying." *Id*. at 160-161. On one occasion during a community visitation at the York Galleria Mall, S.W.C. eloped. *Id*. at 172. While Mother was searching for S.W.C., the older children wandered away from her and began to run through the stores. *Id*. While Ms. Verschoor could see the children playing in the stores, Mother was clueless about their location. Ms. Verschoor stated that the incident was only one example of her concerns over Mother's ability to exercise appropriate supervision.

Additionally, Ms. Verschoor testified that she attempted to address with Mother the effect of her relationship with N.L. However, Mother remained largely unconcerned about her husband's history of sex offenses, and she was incapable of appreciating the risk of harm. *Id*. at 156. Ms. Verschoor reported that Mother "would say that she didn't think there was a safety risk as far as her children but then there are other times that we would talk about it, and she said . . . that she was still very cautious when he was around the girls." *Id*. For example, Ms. Verschoor pointed out that despite Mother's reassuring statements that she trusted N.L. with the children, and her ostensive confidence that the children were safe in his presence, Mother was on edge during the visitations that N.L. attended, and

she was preoccupied with her husband's interactions with the children. ***Id***. at 166-167.

Ms. Verschoor explained that, while Mother improved some components of her parenting skills over the thirty-three visitations that she had with the children, she struggled continually with other components, such as doling out appropriate discipline. ***Id***. at 148. Similarly, she made minimal progress with independent parenting and required consistent prompting to apply the required strategies. ***Id***. at 149. Nonetheless, Mother resisted Ms. Verschoor's attempts to assist her with disciplining the children. ***Id***. at 161-162.

The forgoing evidence sustains the trial court's determination that CYS proved by clear and convincing evidence the statutory grounds to terminate Mother's parental rights to S.W.C. pursuant to § 2511(a)(8). Mother's failure to address her mental health issues stemming from the sexual assaults that she endured as a child, rectify her parenting shortcomings, and erect safeguards to protect S.W.C. from the convicted sex-offender whom she married, despite the obvious danger and the agency's opposition, illustrates that she is unable to care for her son. Thus, as highlighted by the testimony Ms. Beard and Ms. Verschoor presented, CYS adduced clear and convincing evidence to terminate Mother's parental rights. S.W.C. has been removed from Mother for at least twelve months; the conditions that led to S.W.C.'s removal continue to exist; and, as discussed *infra*, involuntary

termination of parental rights would best serve S.W.C.'s needs and welfare. Accordingly, we find that the record supports the trial court's conclusion that CYS satisfied the statutory requirements to terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(8). *See In re Adoption of R.J.S.*, *supra*.

Next, we address whether the trial court abused its discretion in finding that CYS presented sufficient evidence to demonstrate by clear and convincing evidence that terminating Mother's parental rights and permanently severing the existing bond between her and S.W.C. would best serve the child's needs and welfare pursuant to Section 2511(b). While the Adoption Act does not mandate that the trial court consider the effect of permanently severing parental bonds, our case law requires it where a bond exists to some extent. *See In re E.M.*, 620 A.2d 481, 485 (Pa. 1993).

The extent of the trial court's bond-effect analysis depends upon the circumstances of a particular case. *In re K.Z.S.*, 946 A.2d 753, 763 (Pa.Super. 2008). We have emphasized that, while a parent's emotional bond with his child is a major aspect of the § 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the trial court when determining what is in the best interest of the child. *In re K.K.R.-S.*, 958 A.2d 529, 535-536 (Pa.Super. 2008). Indeed, the mere existence of an emotional bond does not preclude the termination of parental rights. *See In re T.D.*, 949 A.2d 910 (Pa.Super. 2008) (trial court's decision to terminate

parental rights was affirmed where court balanced strong emotional bond against parents' inability to serve needs of child).

As we explained in **In re K.Z.S.**, **supra** at 763 (emphasis omitted),

> In addition to a bond examination, the court may equally emphasize the safety needs of the child under subsection (b), particularly in cases involving physical or sexual abuse, severe child neglect or abandonment, or children with special needs. The trial court should also examine the intangibles such as the love, comfort, security and stability the child might have with the foster parent. Another consideration is the importance of continuity of relationships to the child and whether the parent child bond, if it exists, can be severed without detrimental effects on the child. All of these factors can contribute to the inquiry about the needs and welfare of the child.

**See also In re A.S.**, 11 A.3d 473, 483 (Pa.Super. 2010) (orphans' court can emphasize safety needs, consider intangibles, such as love, comfort, security, and stability child might have with the foster parent, and importance of continuity of existing relationships).

Herein, the trial court concluded that severing the parental bond and freeing S.W.C. for adoption was in the child's best interest because the parental bond that nurtures safety, security, and permanency exists between S.W.C. and his foster parents rather than with Mother. **See** Trial Court Opinion, 5/6/14, at 32. Our review of the certified record confirms the trial court's conclusion.

In addition to discussing the duration of S.W.C.'s placement and Mother's inability to remedy the conditions that led to his removal from Mother's care, Ms. Beard's testimony also addressed S.W.C.'s development

in foster care. Ms. Beard testified that S.W.C. was four years old as of the date of the evidentiary hearing. N.T., 1/10/14, at 44. He was diagnosed with oppositional defiant disorder ("ODD") and adjustment disorder with anxiety. *Id*. at 46. Due to his negative behaviors, there is a concern that he may have attention deficit hyperactivity disorder ("ADHD"), but his scheduled neuropsychological evaluation had not occurred when the evidence was presented. *Id*. S.W.C. was referred for play therapy but remains on a waiting list. He has been in a Head Start program since September 2013. *Id*. at 44. He is excelling in the classroom; however, he still experiences disruptive outbursts. N.T., 2/27/14, at 12.

As it relates to S.W.C.'s relationship with Mother, Ms. Beard testified that he generally refers to her as "mom," but has also addressed Mother by her Christian name. N.T., 1/10/14, at 32. She also noted that the child was problematic during the visitations and often challenged Mother's authority. *Id*. at 34. In contrast to that behavior, however, S.W.C. is respectful to his foster parents, and he appears more comfortable in their presence. *Id*. at 34.

Since she has been assigned to this family, Ms. Beard visited S.W.C. and his half-sisters in the foster family once per month. *Id*. at 33. She indicated that S.W.C. is particularly attached to his half-sisters, especially the younger girl, and the foster parents are committed to adopting all three children. *Id*. at 36, 49-50. Similarly, Ms. Beard testified that S.W.C.

bonded with all of the members of the foster family, and he is very happy in the home. *Id*. at 33. Ms. Beard added that S.W.C. enjoyed a particularly close relationship with his foster father, and that he followed appropriate parenting prompts. *Id*. at 35.

Noting that S.W.C. has never inquired about Mother during the caseworker's visits to the foster home, Ms. Beard opined the child's bonds were comparatively stronger with his foster parents and that he would not suffer any long-term negative impacts if the court terminates Mother's parental rights. *Id*. at 36, 59, 126, 130. Specifically, she testified, "although [the children] have visits . . . with mom, they spend [the] majority of the time with the foster family. So I feel like they have bonded more with the foster family over the past 19 months. They appear to be included in th[e] family and the family['s] activities. They're viewed as part of their family." *Id*. at 119.

Similarly, Ms. Verschoor testified that S.W.C. loves his foster family and when the visitations with Mother ended, he was excited to return to the foster home. *Id*. at 154. He did not cling to Mother during the visitations, and when the visitations end, he simply hugs her, says "good-bye", and gets in the van to return home with his foster family. *Id*. at 170. He never acted out or rebelled for being separated from her. *Id*. Ms. Verschoor opined that, although S.W.C. shares a bond with Mother, the bond he enjoys with his foster parents is stronger. *Id*. at 155.

As highlighted by the forgoing evidence, the certified record supports the trial court's needs and welfare analysis pursuant to § 2511(b). No meaningful bond exists between S.W.C. and Mother that would be detrimental to sever. The evidence confirms that S.W.C.'s primary attachment is to his pre-adoptive foster parents and his two half-siblings whose adoption into the same family is pending. Those relationships reveal the hallmarks of healthy parent-child and sibling relationships, including closeness, security and emotional attachment. In contrast, Mother has not cultivated any bond with her son beyond visitation. The fact that S.W.C's primary emotional attachment is with his foster parents rather than Mother is a significant factor in evaluating his developmental and emotional needs and welfare. *See In re K.Z.S., supra* ("the bond between [the child] and [foster mother] is the primary bond to protect, given [the child's] young age and his very limited contact with Mother").

Thus, mindful of the additional factors that should be emphasized during the needs-and-welfare analysis in *In re K.Z.S.*, *supra* at 763, such as "the love, comfort, security and stability the child might have with the foster parent" and the importance of continuing that beneficial relationship, we find that the record confirms that terminating Mother's parental rights best satisfies S.W.C.'s developmental, physical, and emotional needs and welfare. We emphasize that it is highly beneficial that S.W.C and his half-sisters share the same pre-adoptive foster home.

For all of the foregoing reasons, we affirm the trial court order changing S.W.C.'s permanency goal and the decree terminating Mother's parental rights to S.W.C. pursuant to § 2511(a)(8) and (b).

Order and decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/12/2014

# IN THE COURT OF COMMON PLEAS OF YORK COUNTY, PENNSYLVANIA

| In the Interest of: | | : | |
|---|---|---|---|
| S. W. C., | | : | No. CP-67-DP-103-2012 |
| T. A. H., | | : | No. CP-67-DP-104-2012 |
| S. M. H., | | : | No. CP-67-DP-105-2012 |
| | Minor Children | : | Change of Goal |

*****************************

| In Re: Adoption of | | : | |
|---|---|---|---|
| S. W. C., | | : | No. 2013-0119 |
| T. A. H., | | : | No. 2013-0120 |
| S. M. H., | | : | No. 2013-0121 |
| | Minor Children | : | |
| | | | Termination of Parental Rights |

APPEARANCES:

Martin Miller, Esquire
For York County Children and Youth Services

Kelly McNaney, Esquire
GAL for the Minor Children

Ronald Gross, Esquire
For the Mother, R. J. L.

David Worley, Esquire
For C. B. C., Father of S.C.

S.A.H., *Pro Se*
Father of T. A. H. & S. M. H.

Kelly Densel-Ohm
Court Appointed Special Advocate

RECEIVED/FILED
YORK COUNTY
JUDICIAL CENTER

2014 MAY -6 AM 11: 33

DON O'SHELL
CLERK OF COURTS

1

## ADJUDICATION

Before this Court are Petitions for Change of Goal, Petitions to Confirm Consent to Adoption and Petitions for the Involuntary Termination of Parental Rights filed by York County Office of Children, Youth and Families (CYF) on October 30, 2013, regarding S.W.C., whose date of birth is May 28, 2009, T.A.H., whose date of birth is April 25, 2002, and S.M.H., whose date of birth is April 16, 2006.

An evidentiary hearing was held on January 10, 2014 and continued on February 27, 2014, addressing testimony and evidence relating to Mother and both Fathers. The Stipulations of Counsel filed January 3, 2014, were also incorporated into the record for each child. Based upon the testimony and evidence presented at the hearings as well as the history of this case, the Petitions for Change of Goal are GRANTED, and the Petitions for Involuntary Termination of Parental Rights are GRANTED as to R.J.H, n/k/a/ R.J. L. and C.B.C. and the Consents to Adoption filed by S.A.H. are confirmed.

## FINDINGS OF FACT

1. S.W.C. was born on May 28, 2009, to R.J.H. n/k/a R.J.L. (hereinafter "Mother") and C.B.C. No other man has ever claimed to be S.W.C.'s father. The Bureau of Child Support Enforcement has an Acknowledgment of Paternity on file for S.W.C., signed by the aforementioned parents on May 29, 2009.

2

Applications further alleged that Mother was not in compliance with the safety plan that had been developed for the three children.

6. At the shelter care hearing on June 4, 2012, CYF was awarded legal and physical custody of the children for placement in foster care. S.A.H. declined visitation with S.M.H. and T.A.H.

7. Dependency petitions were filed by CYF on June 7, 2012, and a hearing was held on June 12, 2012, at which time the children were found to be dependent and legal and physical custody was confirmed in CYF.

8. On June 13, 2012, a family service plan was established for the family. The objectives for all three parents were as follows: 1) Maintain contact with CYF; 2) Mother to complete non-offending parent classes; 3) Mother to participate in parenting classes/education; 4) Mother to complete a psychological evaluation and follow through with any recommendations; 5) C.B.C. to complete sex offender counseling; 6) Mother and C.B.C. to keep a home free from environmental safety concerns; and 7) S.A.H. to complete a threat of harm evaluation to address his criminal history. (See CYF Ex. #1)

9. The three children were placed into foster care together.

10. Legal counsel was appointed for Mother on July 2, 2012.

4

11. Mother completed a psychiatric evaluation on July 19, 2012; the psychiatrist recommended that Mother engage in trauma theory-informed and attachment theory-informed therapy. Mother was diagnosed with Major Depressive Disorder, recurrent, severe; Post-Traumatic Stress Disorder; and Adjustment Disorder with Mixed Anxiety and Depressed Mood. The psychiatrist opined: "There appear to be legitimate concerns about the ability of the patient to provide a safe and nurturing environment for her children." (See CYF Ex #4.)

12. A ninety-day status review hearing was held on August 29, 2012, to assess progress in the case. Mother and C.B.C. were present. Mother had completed an intake for non-offending parent class on June 11, 2012. It was noted that C.B.C. appeared at the intake with Mother although she denied inviting C.B.C. Mother completed parenting classes at Family Child Resources. Mother had not scheduled the therapy recommended from her psychiatric evaluation. Mother's visits continued to be supervised but were moved into her home. Mother's current paramour who resided three doors away had a conviction for statutory rape. C.B.C. had not completed the sex offender evaluation and had missed two parenting classes. No report was provided for S.A.H. T.A.H. and S.M.H. wrote to the Court indicating that they missed "mommy" very much. T.A.H. was exhibiting behavioral difficulties.

5

13. A permanency review hearing was held on November 7, 2012, before the juvenile hearing officer. Mother was present but neither Father attended the hearing. The caseworker reported that S.M.H. was also a victim of sexual abused allegedly perpetrated by C.B.C. T.A.H. had Brief Treatment from August 2012 through October 2012, however the therapist had left the provider and the service had ended. T.A.H. was struggling academically and behaviorally. Additionally, it was reported that S.W.C. was displaying aggression, including tantrums and biting. Mother had recently married her paramour N.L. and because of the nature of his criminal conviction, a threat of harm evaluation was ordered. (On December 13, 2001, N.L. pled guilty to interference with the custody of children and corruption of minors; he was sentenced to 23 months incarceration. On March 8, 2007, N.L. pled guilty to statutory sexual assault and corruption of minors; he was sentenced to 11.5 to 23 months incarceration.) C.B.C. had been visiting S.W.C. regularly but had missed his most recent visit with no explanation or notice. (It was later determined that C.B.C. had been incarcerated.) C.B.C. was essentially homeless and residing with friends. C.B.C. was attending counseling but denying that he had perpetrated any abuse. It was reported that S.A.H. did not want any involvement with his children. (See Supplemental Findings of Fact, filed 12/4/12.)

6

14. The family service plan was updated on December 11, 2012. Added to the plan were the following objectives: Mother, C.B.C and N.L. were required to complete evaluations due to past criminal history; Mother was required to cooperate with counseling, specifically, weekly therapy at Pressley Ridge; Mother was required to cooperate with an in-home team; all parents and N. L. were required to cooperate with visitation schedule; and Mother was required to ensure that children's medical needs were met by attending medical appointments. (See CYF Ex. #2.)

15. A Court Appointed Special Advocate was appointed for the children on December 28, 2012.

16. On February 5, 2013, a ninety-day status review hearing was held before the juvenile hearing officer. Mother and C.B.C. were present. The Pressley Ridge team indicated an intention to close services as the team asserted that Mother needed more intensive services (therapy) beyond their capabilities. N.L. had not completed his evaluation although it was indicated to be scheduled for February 13, 2013. C.B.C. was incarcerated from October 31, 2012 through December 29, 2012 for a parole violation. C.B.C. was indicated as a perpetrator of sexual abuse against S.M.H. The judicial hearing officer raised concerns regarding failure of children to receive necessary services, specifically counseling for T.A.H. and

7

S.M.H., socialization for S.W.C, and academic assistance for T.A.H. (See Hearing Form filed February 6, 2013.)

17. On February 8, 2013, the Pressley Ridge in-home team closed services with Mother. (The Court notes that this service is different than the individual counseling service Mother was also receiving under the Pressley Ridge umbrella.) The prognosis for the family was determined by the team to be "very guarded as evidenced by the severity of the trauma incurred and the requirement of consistent effort needed to bring about lasting healing in the family relationships and appropriate parenting skills." (See CYF Ex. #9.)

18. A permanency review hearing was held on April 17, 2013, to assess progress. Mother and C.B.C were in attendance. Since June 20, 2012, Mother had missed 20 of 53 therapy appointments. (Four missed appointments were a result of illness of therapist.) Pressley Ridge reported however that Mother was diligent about rescheduling missed appointments. The therapist reported that Mother struggled with recognizing how her own trauma history could affect her parenting abilities. (See CYF Ex. # 5.) N.L. had completed and ABEL assessment at Triad Treatment Services on April 3, 2013 and was scheduled for a risk assessment on April 26, 2013. Mother also had an appointment for a risk assessment on May 1, 2013. Mother indicated a desire to locate a larger residence, however she also

8

reported that the family was delinquent on bills. In January 2013, Mother refused to cooperate with the Pressley Ridge team to formulate a budget. Mother was not employed but reported receiving $720.00 per month is disability income. C.B.C. had obtained full-time employment, however his schedule was interfering with visits; the visitation schedule was adjusted. Commonwealth Clinical Group had terminated services with C.B.C. as a result of C.B.C.'s continued denial that he had perpetrated any abuse. S.W.C. continued to have behavioral difficulties. CYF had disregarded the Court's directive to provide services outside of the foster home to S.W.C. T.A.H. and S.M.H. were also continuing to display behavioral difficulties. The CASA reported some bizarre behaviors on Mother's part. On four separate occasions from October 2012 through March 23, 2013, Mother reported to the CASA, caseworker or children that she was pregnant and that the baby had died. It was later confirmed that Mother had a tubal ligation in July 2012, and Mother's reports of pregnancy thereafter were false.

19. The family service plan was updated on June 4, 2013. The parents' goals remained in place. (See CYF Ex. # 3.)

20. On June 18, 2013, Mother's therapist, Wendy Anderson authored a report regarding Mother's progress. Ms. Anderson indicated that the first goal in working with Mother was to develop a "healing therapeutic alliance" so that

9

Mother would feel safe in processing her own trauma. The therapist noted that building such an alliance "has been complex due to her [Mother's] difficulty in trusting others and her high level of defensive strategies – both of which are typical of victims of unresolved trauma." Ms. Anderson indicated that Mother had only begun to disclose her personal trauma, some disclosures for the very first time. Ms. Anderson further opined that the Triad risk assessment that Mother completed raised "several concerns regarding [Mother's] awareness of the dynamics that led to her daughter's sexual abuse." The therapist indicated that she had confronted Mother in recent weeks regarding Mother's minimization and denial. Ms. Anderson further opined :

> One area of continued concern is that [Mother] excessively relies on others for emotional support- especially her intimate partners. This pattern also appears to be one of the factors that led to the children being sexually abused as this need for emotional support left her unable to end her relationship with the children's abuser. Moreover, [Mother] has found herself emotionally and romantically attached to a man who has a history of sexually offending behaviors and it is this attachment that has delayed her children's return to her home.

(See CYF Ex. # 6, p. 2.)

21. On June 27, 2013, C.B.C. applied for the appointment of legal counsel. C.B.C.'s income disqualified him from the appointment of free legal counsel.

10

22. A ninety-day status review hearing was held on July 16, 2013. Mother had completed a neuro-psychological evaluation, but had not yet received the results. Mother's therapy with Ms. Anderson was much more inconsistent since the prior hearing. Since April 17, 2013, Mother had missed 14 appointments, only one of which was related to the therapist; Mother completed ten appointments during that time period. (See CYF Ex # 7.) Mother had moved into a larger home. A Family Group Decision Making Conference was held on April 17, 2013, and a post conference was held on May 24, 2013. N.L. had completed an ABEL assessment and a risk assessment through Triad Treatment Specialists. C.B.C. scheduled an assessment with Triad Treatment Specialists on August 5, 2013. The Court noted that the Children had been in placement for thirteen months and very little progress had been made and that progress had only been recent.

23. N.L. provided CYF with a copy of his intake summary from Triad Treatment Specialists that occurred in January 2008 as part of his adult probation requirements. N.L. admitted to having sexual intercourse and oral intercourse with a thirteen year-old victim, although he indicated that he believed she was age fifteen or sixteen. N.L. was twenty-four years of age at the time the incident occurred. N.L. also acknowledged knowing that his actions were illegal. N.L. also acknowledged that at age eighteen years, he was charged with corruption of

11

minors for travelling with a friend to Florida with a fifteen year old female. (See CYF Ex. # 12.)

24. N.L. participated in an Abel assessment in April 2013 and in a sexual deviant risk assessment in April and May 2013. Mother also participated in a non-offender risk assessment. Molly Simmons, certified sexual offender treatment specialist specifically noted that N.L. had "demonstrated only limited participation" in his prior sexual offender treatment, ordered while he was under supervision of adult probation. Further, she noted that N.L. "did not complete all of the goals that would be recommended for offenders in order to more confidently endorse their knowledge and integration of risk management concepts." Ms. Simmons opined that N.L.s limited participation was evident in the responses that he gave in the 2013 assessment. Ms. Simmons further opined:

> Given that [N.L.]'s Abel Assessment results indicated that he does maintain a significant sexual interest in adolescent females, [Mother's] oldest daughter would be placed in a greater category of risk and additional strategies should have been discussed and would need to be put in place to best manage and prevent any sexual interest that he may develop in that child. The fact that [Mother] is going to require that her children return into a home in which another sexual offender is present and reportedly refer to him as "Dad" or their father seems highly inappropriate and is again not victim-focused but self-focused.

12

Ms. Simmons recommended N.L. complete a therapeutic polygraph. She also recommended that N.L. engage in ongoing sexual offender treatment. Ms. Simmons recommended that the concerns of the children be respected and addressed. Ms. Simmons recommended that Mother continue in her individual counseling and engage in therapy with N.L. (See CYF Ex. # 13.)

25. Mother completed a neuro-psychological evaluation on June 7, 2013, with David Nicodemus, licensed psychologist, at Healthsouth Reading Rehab Hospital. In the report, dated July 18, 2013, Mr. Nicodemus opines that Mother's level of cognitive functioning is adequate for raising children. Mother was diagnosed with Mood Disorder, NOS, by history, Anxiety Disorder, NOS, by history, Mathematics Disorder and Low Average Intelligence. (See CYF Ex. #8.)

26. C.B.C. underwent an assessment with Triad Treatment Specialists on August 19, 2013. David M. Berk, certified sexual offender treatment specialist, indicated that C.B.C. gave responses on the Adult Cognition Scale that were concerning. C.B.C. agreed with statements that suggest culpability on the part of the child regarding sexual contact with adults. Further, his responses also indicated "that he believes adults may be able to regulate the amount of sexual contact or the kind of sexual contact they have with children in order to spare children any negative emotional impact from the experience." Mr. Berk recommended that C.B.C.

13

complete outpatient sexual offender/sexual issue therapy group and participate in a sexual history therapeutic polygraph to establish a baseline of sexual behavior and determine the appropriateness of his parenting of youth identified as sexual victims. If the polygraph reveals a history of sexual contact with children, C.B.C. should complete an Abel screen. (See CYF Ex # 11.)

27. N.L. completed a therapeutic polygraph on July 30, 2013. N.L. had inconclusive results to questions posed regarding whether since the end of his probation he had engaged in any sexual activity that he wanted to hide and whether he had sexual contact with anyone of questionable age. N.L. could offer no explanation as to why he had shown a response to these questions.

28. On September 24, 2013, S.A.H. signed consents to adoption for T.A.H. and S.M.H.

29. A permanency review hearing was held before the Court on October 1, 2013. C.B.C. had not scheduled any further treatment or evaluation since the August 19, 2013 assessment. A permanency meeting had been held on September 17, 2013, and CYF and all professionals agreed that a change of goal to adoption was in the children's best interest. Mother and C.B.C. disagreed. S.W.C.'s behaviors at visits with Mother had become erratic and S.W.C. had voiced a desire not to visit with Mother.

14

30. On October 24, 2013, privately retained counsel entered an appearance on behalf of Mother. On October 25, 2013, the Court became aware that Mother had retained private counsel and therefore court-appointed counsel for Mother was excused from any further representation of Mother.

31. On October 30, 2013, CYF filed petitions to change goal, petitions for involuntary termination of Mother's and C.B.C's parental rights and petitions to confirm the consents of S.A.H.

32. On January 8, 2014, C.B.C. filed an application for appointment of counsel. Counsel was appointed for C.B.C. on the same date.

33. On January 10, 2014, a hearing commenced which combined the following matters: status review, confirmation of S.A.H.'s consent; change of goal and involuntary termination of Mother's and C.B.C.'s parental rights. For purposes of the status review hearing, it was reported that Mother continued to work with the Catholic Charities team and Mother had been served with an eviction notice and intended to move from her residence. C.B.C. continued to reside with friends in Biglerville and was maintaining employment. C.B.C. had not completed a therapeutic polygraph. S.W.C. was on a waiting list for play therapy and T.A.H. and S.M.H. were receiving weekly therapy.

15

34. On February 27, 2014, the hearings continued on the issues of involuntary termination of parental rights, change of goal and permanency reviews for each of the three children. From June 20, 2012 through December 23, 2013, Mother had 114 appointments scheduled with her therapist at Pressley Ridge. Mother attended 72 of the appointments; Mother was late, cancelled or failed to appear at 35 appointments and the therapist cancelled seven appointments. Wendy Anderson reported that Mother had made minimal progress and spent a majority of her time in sessions venting about the unfairness of the system. Ms. Anderson opined:

> Several significant concerns remain with one of those being [Mother's] inability to give witness to resolve her own childhood trauma. Her inability to fully understand the impact of her own childhood trauma may prevent her from also understanding the impact of her daughter's trauma. Additionally, her inability to fully appreciate the impact of her daughter's trauma, will become an obstacle to her and her daughter developing a meaningful parent- child relationship and will also compromise her ability to serve as a protective force in her children's lives.

As in her prior report (see Finding of Fact No. 21 above), Ms. Anderson again raised her concern regarding Mother's "excessive" reliance on her intimate partners for emotional support. (See Letter dated 1/3/14, from Wendy Anderson, attached to **Permanency Hearing CYF Ex #1**.) Mother continued to indicate a plan to move from her residence after receiving notice of eviction in December

16

2013, but had not yet completed any move. Mother's residence was not appropriate for the children and Mother's plan was to move by March 9, 2014. The Catholic Charities team reported that Mother continued to struggle with applying parenting skills learned in class to interaction with children at visits. C.B.C. had moved into a two-bedroom apartment on January 10, 2014. C.B.C. had made no progress on the recommendations from his sexual offender's evaluation. S.W.C. had undergone a psychological evaluation and been diagnosed with Oppositional Defiant Disorder; he was attending play therapy two times per week. S.W.C continued to exhibit challenging behaviors. S.W.C. had failed a hearing test and been scheduled for an appointment with a specialist. T. A. H. continued in weekly individual therapy and was struggling with emotional expression and processing her trauma. S.M. H. had participated in Brief Treatment from July 8, 2013 through January 14, 2014 but did not respond well to treatment. Individual counseling at T.W. Ponessa had just begun as of February 18, 2014.

35. The children have remained dependent since June 12, 2012.

36. The court had the opportunity to meet with S.M.H. and T.A.H. They both appeared to have bonded with the foster family. Both girls had a general understanding about the meaning of adoption. Both girls felt good about staying

17

with the foster family however T.A.H. indicated that she wanted to be with Mother and believes that her mother is working on her goals.

37. A pre-adoptive resource has been identified for the three children.

38. The Guardian Ad Litem and CASA support the Petitions filed by CYF.


## DISCUSSION

I. Petition for Change of Goal

Before the Court can change the goal for a child in a juvenile dependency action, CYF must prove by clear and convincing evidence that the change of goal would be in the child's best interest. In re Interest of M.B., 449 Pa. Super. 507, 674 A.2d 702 (1996). When determining whether a change of goal is appropriate, the Court must refer to the guidelines set out in the Juvenile Act. In addition to these elements, the Court must take into consideration any and all other factors that bear upon the welfare of the child. Matter of T.R., 445 Pa. Super. 553, 665 A.2d 1260 (1995).

The purpose of the Juvenile Act is to preserve family unity and to provide for the care, protection, safety and wholesome mental and physical development of the child. 42 Pa.C.S.A. §6301(a)(1)-(1.1). The Juvenile Act was not intended to place children in a more perfect home; instead, the Act gives a court the authority to "intervene to ensure that

18

parents meet certain legislatively determined *irreducible minimum standards* in executing their parental rights." In re JW, 396 Pa. Super. 379, 389, 578 A.2d 952, 958 (1990)(emphasis added).

When a child is placed in foster care, the parents have an affirmative duty to make the changes in their lives that would allow them to become appropriate parents. In Re Diaz, 447 Pa. Super. 327, 338, 669 A.2d 372, 377 (1995). A family service plan is created to help give the parents some guidelines as to the various areas that need to be improved. In the Interest of M.B., 388 Pa. Super. 381, 385, 565 A.2d 804, 806 (1989), *app. denied*, 527 Pa. 602, 589 A.2d 692 (1990). By assessing the parents' compliance and success with this family service plan, the Court can determine if the parents have fulfilled their affirmative duty. In re J.S.W., 438 Pa. Super. 46, 53, 651 A.2d 167, 170 (1994).

CYF has proven by clear and convincing evidence that the children's current placements continue to be necessary and are the least restrictive. S.A.H. has had no contact with his children and has executed consents for adoption. C.B.C. has not followed through with the treatment goals that were established for him. C.B.C. has continued to deny any inappropriate behaviors with S.W.C.'s half-siblings. Although C.B.C. has had stable employment for approximately one year, C.B.C. has not had stable and appropriate housing throughout the history of this case. He only recently acquired a

19

two-bedroom apartment after the termination hearings began. Because C.B.C. denied that he was involved in any abuse of S.M.H. or T.A.H., Commonwealth Clinical Group denied services to address inappropriate sexual contact. C.B.C. did not complete a sexual offenders' evaluation until August 2013, fourteen months after the children were adjudicated dependent. To date, C.B.C. has failed to move forward with any of the treatment recommendations.

Initially, Mother did not believe her daughter when she disclosed the abuse. Throughout the course of Mother's treatment, she has continued to lack empathy and understanding for the trauma her daughters have suffered. This lack of empathy is more difficult to understand considering Mother's own trauma-filled history. The concerns regarding Mother's ability to provide a safe home for the children, as raised by Mother's therapist after eighteen months in therapy, and by her psychiatrist after evaluation, are very troubling to this Court. Even more so, this Court has heard Mother testify about the great difficulty she has in placing her trust in a therapist and yet, Mother had no difficulty placing her trust in a man she had dated for five months and then married, even knowing of his criminal convictions for statutory sexual assault and two counts of corruption of minors. Mother has minimized her husband's criminal behavior. Mother has failed to consider the effect upon her children who have been the victims of sexual abuse, of her decision to introduce her children to a man who has perpetrated sexual abuse and to ask

20

her children to accept him in a father-figure role. Mother has placed her own needs above those of her children.

As of the date of the change of goal petitions were filed, neither Mother nor C.B.C. had appropriate living accommodations for her or his respective children. She had only recently met her daughters' teachers. Mother participated minimally in appointments and educational meetings for the children. Neither Mother nor C.B.C. has effectively addressed the safety concerns that have brought the children into care.

C.B.C. only began to address the goals of the family service plan two months prior to the filing of the change of goal and termination petitions and fourteen months after the adjudication of dependency.

Mother has complied with the family service plan to the extent that she participated in a non-offenders class and participated in ongoing counseling, but it became clear that Mother could not or would not be able to ensure the safety of the children. The efforts made by Mother did not result in any substantial improvement in Mother's ability to become a resource for the children and provide a safe and secure home.

CYF has the burden to show a goal change would serve the children's best interests and "[s]afety, permanency, and well-being of the child must take precedence over all other considerations" under Section 6351. In re D.P., 972 A.2d 1221, 1227

21

(Pa.Super. 2009), *appeal denied*, 601 Pa. 702, 973 A.2d 1007 (2009) (emphasis in original). The Pennsylvania Superior Court has held:

> Because the focus is on the child's best interests, a goal change to adoption might be appropriate, even when a parent substantially complies with a reunification plan. In re N.C., supra at 826-27. Where a parent's "skills, including her judgment with regard to the emotional well-being of her children, remain problematic[,]" a goal change to adoption might be appropriate, regardless of the parent's compliance with a permanency plan. Id. at 825. The agency is not required to offer services indefinitely, where a parent is unable to properly apply the instruction provided. In re A.L.D., 797 A.2d 326, 340 (Pa.Super. 2002). *See also* In re S.B., supra at 981 (giving priority to child's safety and stability, despite parent's substantial compliance with permanency plan); In re A.P., 728 A.2d 375, 379 (Pa.Super. 1999), *appeal denied*, 560 Pa. 693, 743 A.2d 912 (1999) (holding where, despite willingness, parent cannot meet "irreducible minimum parental responsibilities, the needs of the child must prevail over the rights of the parent"). Thus, even where the parent makes earnest efforts, the "court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." In re Adoption of R.J.S., 901 A.2d 502, 513 (Pa.Super. 2006).

In re R.M.G., 997 A.2d 339, 345 (Pa.Super. 2010).

In the present case, although Mother complied with CYF's request to undergo non-offender classes and continued to participate in individual therapy, Mother has failed to grasp the concept of safety as it relates to her children who have been victimized. Mother has repeated the same pattern of behaviors that brought the children into

22

placement by marrying a sexual offender during the course of the dependency proceedings and failing to consider the effect that such action would have upon the children. C.B.C. has taken only the initial step of an evaluation very late in the case and has produced no evidence of any follow through with the recommendations made.

CYF has proven by clear and convincing evidence that it is in the children's best interests to change each child's goal to placement for adoption. The minor children have been in foster care for nearly two years. The minor children need a permanent, safe and stable environment. Therefore, the minor children's best interests demand that each child's goal be changed from reunification with a parent to placement for adoption.

II      Petition for Involuntary Termination of Parental Rights

CYF argues that the parental rights of the Mother and C.B.C. to the minor children should be terminated pursuant to 23 Pa.C.S. §2511(a)(1), (2), (5), and (8) of the Adoption Act. CYF has the burden of establishing by clear and convincing evidence that statutory grounds exist to justify the involuntary termination of parental rights. In re Child M., 452 Pa. Super. 230 238, 681 A.2d 793, 797 (1996). The clear and convincing standard means that the evidence presented by CYF is so "clear, direct, weighty, and convincing" that one can "come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." Matter of Sylvester, 521 Pa. 300, 304, 555 A.2d 1202, 1202-

23

1204 (1989). CYF must also present evidence proving that the termination of parental rights will serve the child's best interests. In the Matter of Adoption of Charles E.D.M. II, 550 Pa. 595, 708 A.2d 88, 92-93 (1998). To determine whether termination is within the best interest of the child, the court must examine the possible effect termination would have on the child's needs and general welfare. In re Adoption of Godzak, 719 A.2d 365, 368 (1998).

### CYF Has Proven by Clear and Convincing Evidence that Parental Rights to the Minor Children Must be Terminated Pursuant to 23 Pa.C.S. § 2511(a)(1)

To terminate parental rights under 23 Pa.C.S. §2511(a)(1) of the Adoption Act, CYF must establish, by clear and convincing evidence, that the parent has either demonstrated a settled purpose of relinquishing parental claim to a child or has failed to perform parental duties. In the Matter of Adoption of Charles E.D.M. II, 550 Pa. 595, 708 A.2d 88 (1998). Once one of the two factors has been proven, the Court must examine the following three factors:

1. Parent's explanation for the conduct;

2. Post-abandonment contact between parent and child, and

3. Effect of termination on child.

Id..

24

CYF has proven by clear and convincing evidence that Mother and C.B.C. have failed to perform their parental duties. Mother has failed to demonstrate that she can provide for the safety of the children. For a significant period of time, Mother questioned the credibility of her daughters' reports of abuse. Although Mother has participated in classes and counseling, she has not demonstrated an understanding of how to keep the children safe. At times, Mother has minimized the criminal acts of her new husband and concerns raised by professionals involved in this case. This Court acknowledges that Mother is a victim of trauma herself and at times has been reluctant to address her own issues, however, the Court cannot allow Mother's personal trauma to be an excuse for exposing the children to unsafe situations and the risk of further traumatization.

Mother does not have an appropriate residence to provide for the children; her current residence is not safe or stable. Mother has had the benefit of two in-home teams to assist her in acquiring safe and stable housing. After twenty–two months, she has been unable to accomplish this goal.

C.B.C. has failed or refused to perform parental duties for S.W.C. C.B.C. has only minimally addressed the goals of the family service plan. He has failed to acknowledge any responsibility for the abuse perpetrated upon the half-siblings of S.W.C. He was not able to provide safe and stable housing for S.W.C. until after the filing of the petitions for change of goal and termination of parental rights. For much of the past

25

twenty-two months, C.B.C. has been homeless and/or has resided with friends and has acknowledged that such arrangements would not be appropriate for S.W.C.

S.W.C. has been diagnosed with Oppositional Defiant Disorder and Adjustment Disorder, and has presented challenging behaviors. C.B.C. has made little inquiry into S.W.C.'s issues or treatment. When C.B.C. requested that supervised visits be expanded, he failed to return any additional affidavits for potential supervisors.

C.B.C. has been indicated for sexual abuse by Cumberland County CYF in May or June 2012 and has never completed any treatment for his offending behaviors. C.B.C. acknowledged that he had violated the safety plan by going to Mother's home when he knew he was prohibited from having any contact with the children.

C.B.C. has consistently visited S.W.C., except for periods of incarceration. The Court acknowledges that a bond exists between C.B.C. and S.W.C., however the existence of such a bond is only one factor for the Court's consideration and does not change the fact that other than visiting S.W.C., C.B.C. has failed to perform parental duties.

Additionally, the Court finds credible the testimony of the caseworker indicating that the bond between S.W.C. and foster parents is stronger than the bond between C.B.C. and S.W.C. S.W.C. responds to redirection from foster parents with very little effort as opposed to that given by C.B.C.

26

Once a failure to perform parental duties is established, the second step of the analysis under 23 Pa.C.S. §2511(a)(1) requires the Court to look at the explanation for the conduct, the post-abandonment contact, and the effect of the termination on the child. C.B.C. has denied that he engaged in any inappropriate contact with children. He has continued to visit S.W.C., as noted previously.

This Court cannot say that S.W.C. will not suffer any negative impact as a result of the termination of C.B.C.'s rights. This Court believes that S.W.C. will suffer a period of grief and loss as he is well aware of who his father is. However, C.B.C. has been in denial of the reasons that the child came into placement since the inception of this case. He has repeatedly failed to address his own issues. He has prolonged any possibility of reunification beyond a reasonable period of time.

Thus, while a bond exists between C.B.C. and S.W.C., the severance of which will cause some loss issues for S.W.C., this Court finds that the benefit to S.W.C. to achieve stability and permanency in a loving and safe home outweighs the impact of termination of parental rights. Nearly two years has passed and C.B.C. has never progressed beyond the supervised visitation stage.

Turning to Mother, Mother has acknowledged that she did not support her daughters when they initially disclosed the abuse. Mother felt T.A.H. was lying as she had never observed any concerning behaviors by C.B.C. She chose to believe C.B.C., rather than to protect her children. She has explained that she found it very difficult to

27

open up to her counselor with whom she has been in therapy since July 2012, and yet she had little difficulty opening up to her new husband, N.L., and marrying him with full knowledge of his criminal history as a sex offender. Mother indicated that her participation in non-offenders classes was an eye-opening experience and she believed that she could now protect her children. She also testified however that she does not "believe [her current husband, N.L.] is really an offender" because "he made one mistake." Mother further testified that she had reviewed the results of N.L.'s therapeutic polygraph examination and had no concerns.

The Court acknowledges that Mother has continued to visit the children consistently and that a bond exists between the children and Mother. However, the Court finds that the bond that exists between each of the children and the foster parents is stronger than the bond that exists between each of the children and Mother. The children look to the foster parents for love, protection and security. Again, the children will be negatively impacted by termination of parental rights, however, that impact is lessened when considering what the children will be able to achieve – safety, stability, security, and permanence.

The children deserve the chance to move forward with their lives and engage in grief and loss therapy. Given the change in the current law, exploration of post-adoption contact with Mother should be explored, if a healthy balance can be achieved. Ultimately, other individuals have been meeting the children's physical,

28

emotional and developmental needs for nearly two years, when Mother and C.B.C. have been unable to assume those roles and perform parental duties. The children's best interests will be served by terminating Mother's and C.B.C.'s parental rights and freeing the children for adoption by a loving and caring family, that can meet all of their needs.

Therefore, for all the reasons stated above, CYF has proven by clear and convincing evidence that termination of parental rights to the minor children is justified pursuant to Section 2511(a)(1). Furthermore, termination of parental rights would serve the best needs and welfare of the minor children.

**CYF has Proven that Parental Rights to the Children Must be Terminated Pursuant to 23 Pa.C.S. § 2511(a)(2), (5) and (8).**

CYF has also proven by clear and convincing evidence that the parental rights to the minor children should be terminated pursuant to 23 Pa.C.S. §2511(a)(2), (5) and (8). The mandates of those sections are as follows:

(2)     The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent;

(5)     The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to

29

the parent are not likely to remedy the conditions which led to removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

(8)     The child has been removed from the care of a parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

This Court finds that the conditions that led the children to placement outside the home continue to exist. C.B.C. has failed to address the issues in any significant way. Although services have been provided to Mother, she has failed to demonstrate any ability or even a strong desire to provide a safe and secure environment for the children. At the same time that her children were removed for her failure to keep them safe, Mother was dating another sex offender and proceeded to marry him within a span of five months. Mother failed to consider the impact this action could have on the children. She minimizes his sexual offenses.

The children have remained in placement for twenty-two months. Multiple in-home teams and counseling services have been provided to Mother to assist with reunification and Mother has not succeeded in meeting her goals to achieve reunification.

The Court's Findings of Fact do not need to be reiterated here but clearly and convincingly establish that CYF has met its burden of proving the basis for termination of parental rights.

30

**In consideration of §2511(b), termination of parental rights would best serve the needs and welfare of the minor children.**

Having established the statutory grounds for the involuntary termination of the parental rights of Mother and C.B.C., the Court's final consideration is whether termination of parental rights will best serve the developmental, physical and emotional needs and welfare of the children. 23 Pa.C.S. §2511(b).

> [T]he court must carefully consider the tangible dimension, as well as the intangible dimension - the love, comfort, security, and closeness - entailed in a parent-child relationship. (Citations omitted.) The court must consider whether a bond exists between Child and [parent], and whether termination would destroy an existing beneficial relationship.

In Re:B.N.M., 2004 Pa. Super. 311, 856 A.2d 847 (2004).

This Court has evaluated the bond between the children and Mother, as well as the bond between S.W.C. and C.B.C., previously herein. In all situations, this Court has found that the bond between the children and the foster parents is stronger and healthier than the bond between any of the children and Mother or between S.W.C. and C.B.C. Both T.A.H. and S.M.H. indicated that they felt "good" about staying with the current foster parents. T.A.H. did also indicate that she wants to be with her Mother and believes that her Mother is working on her goals. T.A.H. has also expressed concerns about N.L, Mother's husband.

31

The bond that can provide safety, security and permanency for the children exists between the children and foster parents and not between children and Mother or C.B.C. and S.W.C. Termination of parental rights will best meet the needs of the children and permit them to achieve the permanency that they deserve.

## CONCLUSIONS OF LAW

1. The current placements of T.A.H., S.M.H. and S.W.C. continue to be necessary and appropriate. 42 Pa.C.S. §6351(f)(1).

2. Mother and C.B.C. have been unable and unwilling to effectively utilize, within a reasonable length of time, the services offered to them in a way to become an appropriate resource for the children. 42 Pa.C.S. §6351(f)(2).

3. The circumstances which necessitated the Children's original placement have not been alleviated. Neither Mother nor C.B.C. have demonstrated the stability necessary to address their issues and provide a safe and stable home for the Children. 42 Pa.C.S. §6351(f)(3).

4. The current goal for the children of reunification with a parent is no longer feasible and appropriate because Mother and C.B.C. have failed to meet the

32

irreducible minimum requirements necessary to parent their children. 42 Pa.C.S. §6351(f)(4).

5. The minor children's best interests demand that the current goal of reunification with a parent be changed to placement for adoption.

6. Mother and C.B.C. have failed to perform parental duties for a period well in excess of six months. 23 Pa.C.S.§2511(a)(1).

7. CYF has established by clear and convincing evidence that the incapacity, neglect and refusal of Mother and C.B.C. have caused the Children to be without essential parental care, control or subsistence necessary for their physical or mental well-being and the condition and causes of the incapacity, neglect and refusal cannot and will not be remedied by Mother or C.B.C. 23 Pa.C.S. §2511(a)(2).

8. CYF has established by clear and convincing evidence that the Children were removed from the care of a parent for a period in excess of twelve (12) months, and have never been returned to a parent's care. The conditions which led to the Children's removal from the parents' care continues to exist and neither Mother nor C.B.C. can or will remedy these conditions within a reasonable period of time. Even though reasonable services and assistance have been available to Mother and C.B.C., they

33

have not and are not likely to remedy the conditions which led to the removal of the Children. 23 Pa.C.S. §2511(a)(5) and(8).

9. The Consents to Adoption executed by S.A.H., were freely and voluntarily, knowingly and intelligently given and have not been revoked.

BY THE COURT,

Dated:   May 5, 2014

Marla Musti Cook, Judge

34